NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0841-23

ROSALYN MUSKER,

      Plaintiff-Appellant,

v.

SUUCHI, INC., SUUCHI
RAMESH, MARK HERMAN, and
BEN ZUCKER, individually,

      Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 24, 2024**
>
> **APPELLATE DIVISION**

Argued April 22, 2024 — Decided June 24, 2024

Before Judges Sabatino, Mawla, and Marczyk.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5652-20.

Bruce L. Atkins argued the cause for appellant (Deutsch Atkins & Kleinfeldt, PC, attorneys; Bruce L. Atkins, of counsel and on the briefs, Diane E. Peyser, on the briefs).

Richard A. Grodeck argued the cause for respondents (Piro Zinna Cifelli Paris & Genitempo, LLC, attorneys; Richard A. Grodeck, on the brief).

Alan H. Schorr argued the cause for amicus curiae National Employment Lawyers Association-New

Jersey (Schorr & Associates, PC, attorneys; Alan H. Schorr, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This interlocutory appeal concerns the interpretation of the Wage Payment Law, N.J.S.A. 34:11-4.1 to -4.14, and its application to a defendant employer's commission structure. The trial court ruled the plaintiff employee's commissions in dispute stemming from the sale of Personal Protection Equipment ("PPE") were not "wages" covered by the statute. In granting the employee's motion for leave to appeal, the Supreme Court remanded the case to this court, with the following instruction:

> [The appeal is] summarily remanded to the Superior Court, Appellate Division, for consideration on the merits, limited to whether the commission structure at issue falls within the Wage Payment Law. The motion is denied on all other issues. Jurisdiction is not retained.

Having considered the post-remand briefs and oral argument, we conclude the commissions the employee earned in the applicable months on PPE sales do not comprise "wages" under the Wage Payment Law and instead are "supplementary incentives" excluded by the statute. We therefore affirm the

A-0841-23

trial court's ruling, but, as the trial court recognized, subject to plaintiff's non-statutory contractual claims.

I.

As a prelude to our discussion of the salient facts and allegations, we provide the following brief overview of the Wage Payment Law and related wage laws.

A.

Our Legislature has enacted a series of statutes governing the payment of wages to employees. The statutes include the Wage Payment Law, the Wage and Hour Law, N.J.S.A. 34:11-56a to -56a38, and the Wage Collection Law, N.J.S.A. 34:11-57 to -67.2. In 2019, the Legisature amended these statutes through the adoption of the Wage Theft Act, L. 2019, c. 212. We describe them, in turn.

The Wage Payment Law

The Wage Payment Law governs "the time and mode of payment of wages due to employees." Hargrove v. Sleepy's, LLC, 220 N.J. 289, 302 (2015). The statute "is designed to protect an employee's wages and to assure timely and predictable payment." Id. at 313; see also Maia v. IEW Constr. Grp., 475 N.J. Super. 44, 51 (App. Div. 2023), rev'd on other grounds, ___ N.J. ___ (2024).

A-0841-23

"Although the Wage [Payment] [L]aw does not include a legislative statement of intent, its enactment leads to the conclusion that the statute was designed to protect employees' wages and to guarantee receipt of the fruits of their labor." Rosen v. Smith Barney, Inc., 393 N.J. Super. 578, 585 (App. Div. 2007), aff'd, 195 N.J. 423 (2008).  As the Supreme Court has declared, the Wage Payment Law is therefore a "remedial statute" that should be "liberally construed" to effectuate its remedial purpose.  Hargrove, 220 N.J. at 303.  Thus, we should "approach any question regarding the scope and application of the [Wage Payment Law] mindful of the need to further its remedial purpose."  Id. at 304.

The Wage Payment Law mandates that an employer pay wages at certain regular intervals, at least twice per month or, alternatively, once per month for specially classified employees.  In this regard, N.J.S.A. 34:11-4.2 states in pertinent part:

> every employer shall pay the full amount of wages due to [that employer's] employees at least twice during each calendar month, on regular paydays designated in advance by the employer . . . .  An employer may establish regular paydays less frequently than semimonthly for bona fide executive, supervisory and other special classifications of employees provided that the employee shall be paid in full at least once each calendar month on a regularly established schedule.

4

[(Emphasis added).]

To further its remedial purposes, the Wage Payment Law holds the officers and managers of an employing corporation personally liable if that corporation fails to pay wages to an employee in violation of the statute. See N.J.S.A. 34:11-4.1 ("For the purposes of this act the officers of a corporation and any agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation.").

The Wage and Hour Law

Although related but not directly at issue in this appeal, the Wage and Hour Law imposes additional requirements concerning the payment of wages. That companion statute "is designed 'to protect employees from unfair wages and excessive hours.'" Hargrove, 220 N.J. at 304 (quoting In re Raymour & Flanigan Furniture, 405 N.J. Super. 367, 376 (App. Div. 2009)). For example, the Wage and Hour Law "establishes . . . a minimum wage . . . [and] an overtime rate for each hour of work in excess of forty hours in any week for certain employees." Ibid. (citing N.J.S.A. 34:11-56a4).

The Wage Collection Law

Another wage-related statute, the Wage Collection Law, prescribes a process for the collection of unpaid wages due. Among other things, the Wage

5

Collection Law empowers the New Jersey Department of Labor and Workforce Development to investigate and remedy alleged wage violations. N.J.S.A. 34:11-58.

The 2019 Wage Theft Act

Enacted in August 2019, the Wage Theft Act expanded the liability that employers can face for state wage law violations. L. 2019, c. 212. That legislation substantially amended the three New Jersey wage statutes we have identified above.

Specifically with respect to the Wage Payment Law, the Wage Theft Act confers upon an aggrieved employee the right to

> recover in a civil action the full amount of any wages due, or any wages lost because of any retaliatory action taken in violation of [N.J.S.A. 34:11-4.10(a)], . . . plus an amount of liquidated damages equal to not more than 200 percent of the wages lost or of the wages due, together with costs and reasonable attorney's fees.
>
> [Maia, 475 N.J. Super. at 50-51 (quoting N.J.S.A. 34:11-4.10(c) (emphasis omitted)).]

In this manner, the Wage Theft Act strengthened the protections afforded under the Wage Payment Law, by creating an express private right of action for

employer violations and authorizing the recovery of liquidated damages and attorney's fees.  See N.J.S.A. 34:11-4.10(c).[1]

B.

Defining "Wages"

The Wage Payment Law, the Wage and Hour Law, and the Wage Collection Law each define the term "wages" using somewhat different language.  Notably for this appeal, all those statutes refer to "commissions" within their definitions of wages.

The core statute on point here, the Wage Payment Law, defines "wages" as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J.S.A. 34:11-4.1(c) (emphasis added).[2]

---

[1]  The Legislature has also provided a good faith defense to the liquidated damages provision, although that defense is not relevant to the definitional issue posed by the present appeal.  See L. 2019, c. 212, § 2 (codified at N.J.S.A. 34:11-4.10(c)).

[2]  We dissect this definition in Part III of this opinion.

A-0841-23

Meanwhile, the Wage and Hour Law defines "wages" as "<u>any moneys due an employee from an employer for services rendered</u> . . . as a result of their employment relationship <u>including commissions, bonus</u> and piecework compensation and including the fair value of any food or lodgings supplied by an employer to an employee." N.J.S.A. 34:11-56a1(d) (emphasis added). That statute does not contain the exclusion for "supplementary incentives and bonuses" set forth in the Wage Payment Law.

Lastly, under the Wage Collection Law, "wages" consist of "<u>any moneys due an employee from the employer</u> whether payable by the hour, day, week, semimonthly, monthly or yearly and <u>shall include commissions, bonus,</u> piecework compensation and any other benefits arising out of an employment contract." N.J.S.A. 34:11-57 (emphasis added). This statute likewise does not exclude "supplementary incentives and bonuses."

## II.

With this statutory framework in mind, we summarize the pertinent factual background from the record. We do so with the caveat that there are some factual disputes in this case, as the matter has not been tried.

The Parties and Plaintiff's Employment

Plaintiff Rosalyn Musker was employed by defendant Suuchi, Inc., ("Suuchi"), a New Jersey software company. Co-defendant Suuchi Ramesh was the company's Chief Executive Officer. Co-defendant Mark Herman was Suuchi's Chief Financial Officer, and co-defendant Ben Zucker was plaintiff's supervisor. It is uncontested that the terms of the New Jersey wage statutes apply to plaintiff's employment.

Plaintiff was hired by Suuchi as a Senior Platform Delivery Manager on January 6, 2020, at a base salary of $80,000. At the time plaintiff was hired, Suuchi's core business was the operation of a proprietary, software-driven platform for apparel manufacturers. In particular, Suuchi marketed software-as-a-service ("SaaS") and platform-as-a-service ("PaaS") products, as well as third-party logistics services ("3PL Services"). In providing these three forms of services, its business model focused on the sales of subscription packages to manufacturers. The firm's primary revenue came from these subscriptions and their generation of Annually Recurring Revenue ("ARR").

A few weeks after she was hired, around mid-February 2020, plaintiff was transitioned to the role of Senior Enterprise Sales Manager. In that sales position, plaintiff maintained her $80,000 annual salary. She also became

9

eligible to receive commissions pursuant to the company's annual Individualized Sales Commission Plan ("SCP"), effective as of January 1, 2020.

The SCP defined how and when commissions would be paid to an individual salesperson for the calendar year 2020. The SCP declared in section 1 that "[e]ach year an Individualized Sales Compensation Plan will be developed that outlines specific goals and commission rates under which commissions are earned by each regular, full-time Sales Team Employee ('Team Member')."

Under section 4 of the SCP, "Eligible Revenue" for plaintiff was defined to consist of:

> a. Professional Services Revenue derived from Initial Implementation fees, time and material projects, and fixed fee projects as part of the initial implementation. For the avoidance of doubt, post acceptance [statement of work] professional services are not commissionable unless otherwise specified in the Sales Compensation Plan.
>
> b. PaaS, SaaS and 3PL revenue[,] subject to the exclusions below.
>
> > a. Revenue for Existing Customer contract renewals or contract auto-renewals is not considered eligible revenue unless otherwise specified in the [SCP].
> >
> > b. Revenue from exceeding contractual minimum commitments which are one-time in nature.

c. In the event that management engages with the Team Member to assist in a management lead account and or House Account, then both commission and quota relief is 50% of the then current tier per table in Section 2.

Under Section 5, the SCP defined "Earned Commission" as a form of "compensation earned by Team Members based on rates described within this agreement." The structure for calculating such commissions for plaintiff individually on PaaS sales was depicted in the following chart:

| Commissions PaaS | | | | |
|---|---|---|---|---|
| | **Quota Dollars** | **Percent of Quota** | **Commission Rate** | **Commission $ at Top of Tier** |
| Commission-Tier 1 | [First] $729,167 | 1%-25% | 1.75% | $12,760 |
| Commission-Tier 2 | [Second] $729,167 | 26%-50% | 2.25% | $16,406 |
| Commission-Tier 3 | [Third] $729,167 | 51%-75% | 2.75% | $20,052 |
| Commission-Tier 4 | [Fourth] $729,167 | 76%-100% | 3.25% | $23,698 |
| Commission-Tier 5 | $2,917,668 [and above] | 101% Plus | 4.00% | |
| Total commissions at plan | | | | $72,917 |

Under this commissions structure for PaaS sales, plaintiff's sales up to $729,167 (Tier 1) would be paid at 1.75%. Upon reaching that level, plaintiff would move to Tier 2, for which commissions are paid at a higher rate of 2.25% before attaining another $729,167 in sales and progressing to Tier 3. In Tier 3, plaintiff would be entitled to commissions at an increased rate of 2.75% on that revenue before progressing to Tier 4, where again she must have sold another $729,167 with a commission rate of 3.25% at that tier before progressing to the

11

top tier (Tier 5). At that point, after attaining an aggregate of $2,917,668 in sales, commissions are paid at the peak rate of 4%.

The SCP further specified that a commission is not earned until various conditions are met:

> The following events must occur for the commission to be considered "Earned":
>
> > a. Mutually executed binding contract or other agreement has been entered into for selling product and services to Suuchi customer[s].
> >
> > b. Team Member was assigned to or developed the customer account, was significantly involved in the sales process and provides Suuchi with the fully executed contract.
> >
> > c. Team Member is employed as a regular employee in good standing when an Earned Commission event occurs.
> >
> > d. Management reserves the right to adjust commissions for unintended consequences and/or sales that fall outside of the Company's standard customer contract model.

The timing of commission payments was governed by section 7 of the SCP. That provision directed that "[c]ommission payments are <u>made on [the] last monthly regular pay date</u> that corresponds with the Suuchi payroll-

processing schedule. Commission amounts due are <u>paid on the final payroll of each month for all commissions meeting payment criteria as of the prior month-end</u>." (Emphasis added).

Section 12 of the SCP declared the company's authority to change the compensation plan. Specifically,

> <u>Suuchi reserves the right to change or modify</u> the policies, procedures or compensation plan <u>at any time at its discretion</u> and will provide <u>reasonable advance notice</u> of any material modifications.
>
> [(Emphasis added).]

Section 12 further elaborated:

> Although intended to cover all sales situations, <u>when a new situation arises, i.e., a new product or service offering is defined</u>, or a provision requires change, <u>the document will be amended, and each Sales Team Member will be informed in writing</u>. In these cases, the updated document will be forwarded for acknowledgement and signature.
>
> [(Emphasis added).]

Additionally, Section 3, the "Definitions" provision of the SCP, denoted what was termed a "Bonus Commission."[3] This provision stated that "[o]nce the

---

[3] As we will discuss in Part III, the term appears to conflate the discrete concepts of a "bonus" and a "commission" within the Wage Payment Law.

<span style="float:right">A-0841-23</span>

Team Member achieves 110% of the Annual Quota[,] a one-time bonus commission will be paid in the amount of 0.75% times Quota."

Plaintiff's Efforts to Generate the Sale of PPE to the State of New York and Her Claimed Commissions

In March 2020, after the onset of the COVID-19 pandemic, Suuchi ventured into the PPE market. In particular, Suuchi sought to obtain PPE products from Chinese suppliers to resell in the United States.

Advancing that new business venture, plaintiff took part in a transaction in which Suuchi sold PPE to the State of New York, which generated gross sales revenue of over $32 million from March 2020 through June 2020. The relevant sequence of events is as follows.

On Sunday, March 22, 2020, plaintiff began communicating via text with a former acquaintance, Larry Fox, about the possible sale of PPEs. That initial contact started a process that culminated in the State of New York, through Fox, purchasing large orders of PPE from Suuchi.

The very next day and the first business day after plaintiff's initial text communication with Fox, Herman announced the terms of commissions for PPE sales in a Zoom meeting with the company's sales force. Herman followed up on that meeting with this internal email:

As we discussed today in our update meeting <u>for all PPE deals</u>[,] <u>we will be recording these deals on a net basis as opposed to gross</u>[,] <u>which we have done historically on our PaaS deals</u>. This is being done as the nature of our services are different and accordingly our markup for our services is our revenue. For example, if the order value is $500,000 and our cost is $400,000 then our markup or our fee for services provided would be $100,000. Sales commission will be calculated using our revenue which in this example would be $100,000 times the respective tier rate per your commission agreement. <u>Commission payments for PPE orders will be based on cash receipts and will be made the month after the month the cash is received.</u> Using the previous example, assuming the deal signs tomorrow and cash is received Friday[,] then the commission payment would be made the second payroll of April.

<u>These deals are a great way to max out on your commission rates</u>. Once you max out your commission tiers, the commission is $40,000 for every $1 million of revenue to the company.

[(Emphasis added).]

Herman's email to the sales force was followed by an email from Ramesh, the company CEO, the same day:

Hi all

We are providing <u>same commissions on these one</u>[-] <u>time orders and not penalizing for not being ARR</u>. For now, let[']s <u>max out on cash you can each make</u>. Commitment, perseverance, gumption and hustle shall be rewarded[.]

Thanks,

Suuchi [Ramesh]

[(Emphasis added).]

With plaintiff's continued participation, negotiations between the company and New York rapidly proceeded for the PPE sales. The first purchase order for the sale of PPE to the State of New York, in the amount of $5,430,000, was dated March 26, 2020. The total of all the company's PPE sales to New York, from March through June 2020, exceeded $32 million.[4]

By the end of May 2020, defendant had paid, and plaintiff had accepted, a total of $100,000 (in two payments) toward her commissions on the New York PPE sales. In the months that followed, plaintiff and company officials had some discussions of settling the additional commissions that she claimed were owed to her, but nothing was resolved.

---

[4] The parties disputed how to calculate the commissions appropriately. Plaintiff asserted they should be based on gross revenue, while the company contended they were based on net revenue. Additionally, the company contended the commissions were not calculable, and thus payable, until a deal was settled, and the net revenue was determined pursuant to the SCP. In any event, the proper mathematical calculation of plaintiff's contractually-owed commissions is not at issue in the present appeal.

Plaintiff contended that Suuchi's tiered[5] commission structure, which was in effect as of January 2020, entitled her to $1,315,957.93 in commissions on the New York PPE sales. She further alleged that in an attempt to deprive her of those fully earned commissions, Suuchi retroactively changed the commission structure without notice, thereby withholding more than $1 million in earned commissions from her.

In response, defendants maintained that plaintiff was not entitled to commissions on the "one-time" PPE sales under the terms of her SCP. They contended that the March 2020 change in policy provided more restrictive compensation based on net (not gross) revenues for PPE sales.

This Litigation

In September 2020, plaintiff filed a complaint in the Law Division alleging Suuchi and the individual defendants had failed to pay her the rightful amount of her earned commissions. Among other things, plaintiff alleged defendants' violation of the Wage Payment Law, breach of contract, and tortious interference with contractual relationships.

---

[5] A "tiered" commission structure, "sometimes referred to as a variable commission scheme" is a commission plan in which the percentage of sales paid increases or decreases as the employee attains increasing benchmarks of production. Amir Fazli et al., Tiered Commission Schemes in Online Marketplace 1 (Apr. 2023) (first draft ), https://ssrn.com/abstract=4820568.

After discovery, the parties filed cross-motions for summary judgment. Plaintiff moved for partial summary judgment (on liability only) for alleged unpaid wages under the Wage Payment Law. Suuchi cross-moved for summary judgment to dismiss the Wage Payment Law claims. Separately, the individual defendants also cross-moved for summary judgment to dismiss all claims against them, asserting their alleged individual liability was predicated on unproven violations of the Wage Payment Law.

The Motion Judge's Ruling

On August 10, 2023, the trial court denied plaintiff's partial summary judgment motion and granted defendants' cross-motions to dismiss the Wage Payment Law count. In its written opinion, the court found that plaintiff's commissions were "supplementary incentives" rather than "wages" and thus were excluded from the Wage Payment Law.

The court concluded:

> At issue on all the [Wage Payment Law] summary judgment motions is whether commission payments claimed by plaintiff to be past due are wages, as defined by the [Wage Payment Law], or supplementary incentives, not subject to the [Wage Payment Law]. Because the court finds they are supplementary incentives rather than wages, the court denies summary judgment to plaintiff and grants summary judgment to all defendants on the [Wage Payment Law] counts.

In support of that conclusion, the court reasoned:

> Based on the totality of these circumstances, this court is persuaded that the commissions in plaintiff's situation are a supplementary incentive, not a wage. The court relies on the facts that plaintiff is already entitled to an $80,000 salary regardless of her sales and plaintiff's commission rates increase as her sales volume increases. <u>These facts suggest the commissions are designed to motivate and incentivize plaintiff to go above and beyond in her sales performance, and the commissions are calculated independently of her regular wage</u>.
>
> [(Emphasis added).]

<u>This Interlocutory Appeal</u>

Plaintiff moved this court for leave to appeal the trial court's summary judgment decision. The National Employment Association, New Jersey ("NELA-NJ"), filed an amicus curiae brief in support of plaintiff's statutory arguments.

A panel of this court denied plaintiff's motion for leave to appeal. Plaintiff then moved to the Supreme Court for leave to appeal, which the Court granted on the discrete issue of the Wage Payment Law, as set forth in the introduction to this opinion. This limited remand from the Supreme Court followed, with merits briefing and oral argument.

III.

The pivotal question the Supreme Court has referred to us is whether any commissions payable under Suuchi's compensation plan for PPE sales comprise "wages" within the scope of the Wage Payment Law. Or are they instead, as the trial court found, "supplementary incentives" not covered by the statute? To undertake that analysis, we are guided by cardinal principles of statutory interpretation.

A.

When interpreting the meaning of a statute, a court must aim "to effectuate the Legislature's intent." W.S. v. Hildreth, 252 N.J. 506, 518-19 (2023) (citing Gilleran v. Twp. of Bloomfield, 227 N.J. 159, 171 (2016)). "The best evidence of such intent 'is the statutory language,' read in accordance with its 'ordinary meaning and significance and . . . in context with related provisions so as to give sense to the legislation as a whole.'" Sanjuan v. Sch. Dist. of W. N.Y., 256 N.J. 369, 378 (2024) (quoting W.S., 252 N.J. at 518-19) (internal citations omitted); see also DiProspero v. Penn, 183 N.J. 477 (2005).

We must "start with the plain language of the statute. If it clearly reveals the Legislature's intent, the inquiry is over." State v. Harper, 229 N.J. 228, 237 (2017) (citing DiProspero, 183 N.J. at 492). However, "[w]hen a literal

20

interpretation of individual statutory terms or provisions would lead to results inconsistent with the overall purpose of the statute, that interpretation should be rejected." Sanjuan, 256 N.J. at 379 (quoting In re Civ. Commitment of W.W., 245 N.J. 438, 449 (2021)).

Courts often may confront text within a statute that is ambiguous. If we perceive that such an ambiguity in the statutory language "leads to more than one plausible interpretation, we may turn to extrinsic evidence." DiProspero, 183 N.J. at 492. Such extrinsic evidence may include "legislative history, committee reports, and contemporaneous construction.'" Id. at 493 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

Lastly, it is well established that appellate courts review trial court rulings on statutory interpretation issues de novo. Sanjuan, 256 N.J. at 378; W.S., 252 N.J. at 518-19. That is because the meaning of a statute is a question of law, warranting no special deference to a trial court's interpretation. Manalapan Realty, L.P., v. Twp. of Comm. of Manalapan, 140 N.J. 366, 378 (1995).

B.

Bearing in mind those principles, we begin our analysis by closely examining the relevant text within the Wage Payment Law. We reiterate the critical language defining "wages" here:

21

As used in this act [i.e., the Wage Payment Law]:

. . . .

c. "Wages" means the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto.

[N.J.S.A. 34:11-4.1.]

To ascertain the plain meaning of this definition of wages as applied to plaintiff's SCP, we consider it in segments.

The "direct monetary compensation for labor or services rendered by an employee"

The first segment we discuss reads: "the direct monetary compensation for labor or services rendered by an employee." N.J.S.A. 34:11-4.1(c). To give effect to the word "direct" within this definition of wages, we interpret the statute to define wages as including only monetary compensation that is directly due and payable to an employee for the labor or services provided.[6]

_____

[6] See Merriam-Webster's Collegiate Dictionary 353 (11th ed. 2014) (defining "direct" as "marked by an absence of an intervening agency, instrumentality, or influence"); Black's Law Dictionary 576 (11th ed. 2019) (defining "direct" as "straight; undeviating" or "[f]ree from extraneous influence; immediate").

This "direct" element is satisfied here. Plaintiff rendered her labor and services to the company to help generate the PPE sales. She seeks, in the form of commissions, "direct monetary compensation" for her labor and services. The company's SCP declares that its salespersons who earn commissions on eligible sales[7] through their labor and services will be paid with money—not with some other form of compensation such as stock options or the use of a company car. The promised compensation is to be paid to the employee directly by the company, and not through a third party. In addition, the compensation is earned under a formula directly based on the employee's individual work efforts.

<u>"Where the amount is determined on a time, task, piece, or commission basis</u>"

The next segment of the statute's definition of wages ("where the amount is determined on a time, task, piece, or commission basis") is also satisfied. N.J.S.A. 34:11-4.1(c). Plaintiff and other salespersons at Suuchi were promised what the company denoted within its SCP as "commissions." Such commissions would be earned by performing the "task" of generating sales, pursuant to the tiered revenue-based formula presented in the SCP's chart.

---

[7] We discuss, infra, whether the PPE sales are eligible sales under the terms of plaintiff's SCP.

This commonly understood notion of a "commission," i.e., money that a salesperson can earn by making specified levels of sales, is supported by dictionary definitions and case law.  The ordinary meaning of "commission" has been defined as "a fee paid to an agent or employee for transacting a piece of business or performing a service."[8]  See also Malinowsky v. Lincoln Developing Co., 103 N.J.L. 394 (E. & A. 1927) (adopting a comparable dictionary definition).

As we pointed out above, the related New Jersey statutes—the Wage and Hour Law, N.J.S.A. 34:11-56a1(d), and the Wage Collections Law, N.J.S.A. 34:11-57—also expressly include commissions within their respective definitions of wages.  The statutory language is readily harmonized.  See State v. Gomes, 253 N.J. 6, 15-16 (2023) (recognizing the court's goal of harmonizing the language of related statutes).  Commissions can be an eligible form of wages under all three statutes.

"Excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto"

The third segment of the statutory definition ("excluding any form of

---

[8]  Merriam-Webster's Collegiate Dictionary, 249 (defining "commission"); see also Black's Law Dictionary, 338 (defining "commission" as "[a] fee paid to an agent or employee for a particular transaction, usu[ally] as a percentage of the money received from the transaction").

supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto") is at the heart of the parties' dispute. N.J.S.A. 34:11-4.1(c). The wording of the statute and its meaning warrants further assessment.

We begin our analysis of this exception by noting it is not preceded by a comma. That lack of a comma raises a grammatical question of whether the exception qualifies only the term "commission basis," which immediately precedes it, or whether the exception modifies the entire preceding text of the definition. We do not think it matters. That is because, as our forthcoming analysis demonstrates, the exception—either read without a comma or with an implied one—can excise from the statutory definition of wages commissions earned on eligible revenue generated by Suuchi salespersons.

As quoted above, the exception contains the terms "supplementary incentives" and "bonuses."[9] Neither of those terms, which we discuss in more depth below, is defined within the statute.

In an explanatory clause appearing right after the word "bonuses" and without punctuation, the exception does state: "which are calculated

_____

[9] We need not address here why the Wage and Hour Law and the Wage Collection Law treat bonuses as wages, but the Wage Payment Law does not.

independently of regular wages and paid in addition thereto." N.J.S.A. 34:11-4.1(c). It is unclear whether that clause pertains only to bonuses and not also to supplementary incentives. We will assume, for the sake of our discussion, the clause is intended to cover both forms of compensation.

"Calculated independently of regular wages and paid in addition thereto"

Unpacking the explanatory clause in parts, we consider whether the compensation at issue is "calculated independently of regular wages and paid in addition thereto." N.J.S.A. 34:11-4.1(c). The statute does not define or explicitly distinguish "regular" wages from other wages. Apparently, it means that some (non-regular) wages are not to be treated as wages.

Despite the statute's vagueness of phrasing, the tiered scale within the SCP establishes that commissions at Suuchi are calculated "independently" from a salesperson's salaries, if any. As such, they are manifestly "paid in addition" to salaries.

That said, we must now circle back to the earlier terms of the exception. Taking them in reverse order, is a Suuchi salesperson's commission a "bonus"?

Bonus?

A bonus is commonly defined as

> something in addition to what is expected or strictly due: such as

[a] money or an equivalent given in addition to an employee's usual compensation;

[b] a premium (as of stock) given by a corporation to a purchaser of its securities, to a promoter, or to an employee;

[c] a government payment to war veterans; [and] a sum in excess of salary given to an athlete for signing with a team."[10]

The payment of a bonus may not always be contingent on an individual employee's performance. It instead may be based on a company's overall profitability. Or it may be prompted by competition within the labor market, enabling a company to attract and retain workers who otherwise may be enticed by bonuses offered by other employers.

For instance, a salesperson might receive a bonus if the company as a whole has had a sufficiently profitable year, even if that employee's own sales did not rise. Or the bonus may be prompted by bonuses offered by competing firms. Conversely, if the company's profits are down (due to, say, the higher

---

[10] Merriam-Webster's Collegiate Dictionary, 191; see also Black's Law Dictionary, 224 (defining bonus as "[a] premium paid in addition to what its due or expected; esp., a payment by way of division of a business's profits, given over and above normal compensation").

costs of goods or services it supplies), the company might not pay bonuses to individual salespersons, even if they increased their personal sales.

Bonuses may take the form of stock options or other deferred compensation, vacation trips, retention bonuses, or other benefits extended by an employer. They are generally distinct from commissions tied to individual sales figures.

Based on these concepts, we conclude that the tiered commissions delineated in the SPC and payable within specified pay periods are not bonuses, with the exception of the so-called year-end "bonus commission."

Supplementary Incentive?

But even if it is not a "bonus," is a commission promised by Suuchi for PPE sales a "supplementary incentive," as the trial court found? We agree that it is, given the particular circumstances presented.

To give effect to the words "supplementary incentive" in the Wage Payment Law's definition of wages, the term logically should be read to mean an incentive in addition to direct compensation for services or labor.[11] The ordinary meaning of the term "incentive" connotes "something that incites or

---

[11]    See Merriam-Webster's Collegiate Dictionary, 1256 (defining "supplementary" as "added or serving as a supplement: additional").

has a tendency to incite to determination or action."[12]  Both "supplementary" and "incentive" must be read together, as the Legislature used the word supplementary as an adjective that modifies the word incentive.

Accordingly construing these two words in conjunction, the term "supplementary incentive" should be interpreted to mean <u>additional</u> compensation or perks that can motivate employees to take action beneficial to the employer, <u>above and beyond</u> the monetary payments directly owed to them for their labor or services.  The mere fact that compensation generally functions inherently as an incentive to an employee to come to work and perform assigned tasks is not enough to make it a "supplementary" incentive.

If any modicum of incentive were enough to fit the exclusion, then all salaries and commissions would not be wages because they have the capacity to incentivize workers.  Such an overbroad interpretation is unsound.  The proverbial exception would swallow the rule.[13]

---

[12]  <u>Id.</u> at 629.

[13]  Some examples of supplementary incentives outside of a commissions context might be an employer offering $1000 to an employee for, say, perfect attendance for a full year, volunteering to share an on-site office or workstation with another employee, or agreeing to relocate to a satellite office.

A-0841-23

To date, no published New Jersey opinions have resolved this thorny definitional issue concerning sales commissions and supplementary incentives.[14] The only published opinion on point is the federal district court's decision in Sluka v. Landau Uniforms, Inc., 383 F. Supp. 2d 649 (D.N.J. 2005). The plaintiff in Sluka was employed as a sales territory manager for the defendant company. Id. at 652. The parties' written employment agreement provided, among other things, that the plaintiff would be paid a base annual salary, "plus" a 1% commission on all net sales on accounts assigned to him, "plus" a 2% commission on net sales from new customers that the plaintiff generated, "plus" a 2% commission on "year over year increase[s]" in net sales on assigned accounts. Ibid. The agreement further specified that the salary portion of the plaintiff's compensation would be paid weekly or bi-weekly, the "commission-based portion will be paid monthly, on the 10th of each month for sales accruing the preceding month," and "[t]he bonus portion will be paid at year end." Ibid.

The plaintiff in Sluka was terminated by the defendant employer. Id. at 653. As of the time of his discharge, the plaintiff had been paid his salary and

_____

[14] Several unpublished opinions, which we will not cite or analyze here, see Rule 1:36-3, have attempted to do so, with varying approaches and results. Some cases treat sales commissions as supplemental incentives that are not wages while others have ruled to the contrary or adopted a more nuanced view.

his 1% monthly sales commissions. Id. at 654. However, the employer withheld payment for his 2% year-over-year increase in sales, and the 2% commission on net sales for new customers he had generated. Ibid. The plaintiff filed suit against the employer, raising claims of discrimination and other grounds for recovery. Id. at 651. His lawsuit included a claim that the employer violated the Wage Payment Law with respect to the moneys withheld. Ibid.

The employer asserted that it had no legal obligation to pay the plaintiff any additional compensation, including both of the 2% items, because he was no longer working for the company. Id. at 655. The district court rejected that timing contention, determining that "[t]he nomenclature for these two payments does not change the fact that they are compensation for [the] [p]laintiff's services already rendered." Ibid. Even so, the court dismissed the plaintiff's claims as to the two 2% items under the Wage Payment Law, deeming those items to be "supplementary incentives." Id. at 656. The court reasoned that the 2% commission based on sales to new customers was "designed to motivate and reward a salesperson who seeks out and creates the clients." Ibid. Additionally, the court deemed the 2% year-over-year increase payment as supplementary incentive because it was "aimed to motivate and reward a salesperson who creates more business each year." Ibid. Left undisturbed was the 1% monthly

31

commission that the plaintiff had already received on sales made to assigned existing customers. Ibid.

Defendants in the present case rely on Sluka as supportive of their argument that plaintiff's unpaid commissions on the PPE are unenforceable under the Wage Payment Law because Suuchi's commission structure for PPE was designed to motivate employees to make sales. Plaintiff and the amicus, on the other hand, argue that Sluka is at least partially helpful to their position, insofar as the portion of commissions payable monthly to Sluka was not excluded from his "wages."

We are not bound by the district court's legal analysis in Sluka, because the interpretation of the New Jersey law and, specifically, the Wage Payment Law, is a question to be resolved definitively by our state courts and not by a federal court exercising its diversity jurisdiction. See Teeters v. Div. of Youth & Fam. Servs., 387 N.J. Super. 423, 429 (App. Div. 2006) (citing e.g., In re Application of White, 18 N.J. 449, 453-54 (1955)). However, Sluka is correct that labels utilized by an employer do not necessarily dictate what compensation is or is not "wages" under the Wage Payment Law. But we are unpersuaded to adopt the exact same construction of the statute as the district court. Instead, we proceed with our own state-law analysis.

## C.

As we underscored before, the Supreme Court has instructed that the Wage Payment Law must be liberally construed to effectuate its remedial purpose. Hargrove, 220 N.J. at 303. We similarly have declared that the statute was "designed to . . . guarantee [employees] receipt of the fruits of their labor." Rosen, 393 N.J. Super. at 585. These robust public policies, most recently amplified by the Wage Theft Act, support a liberal construction and application of the concept of "wages" in this case. But even applying such a liberal construction of the statute, we conclude the commissions that defendants chose to offer on the PPE sales through the March 2020 communications by Herman and Ramesh were "supplementary incentives" as distinct from ordinary commissions.

The SCP the company created individually for plaintiff at the outset of her employment in January 2020 did not, by its terms, make the revenue on PPE sales eligible for a sales commission. Plaintiff's right to obtain commissions under the SCP was limited—in the absence of an alteration of the company's policies—to sales that generated ARR. The revenue obtained by Suuchi on the PPE sales was not "annual recurring revenue." Instead, the revenue was generated by the one-time sale of equipment that suddenly became in demand

because of the worldwide COVID-19 pandemic. The commission percentages on plaintiff's SCP were expressly tied to plaintiff attaining her assigned "Quota-ARR" on eligible sales.

The PPE sales were not eligible sales under the categories of revenue enumerated in the SCP. As we noted above, Section 4 of the SCP defines "eligible revenue" in a limited manner. However, as the result of the March 2020 communications by Ramesh and Herman with the sales force, the company elected to alter its compensation structure for the specific and impromptu purposes of promoting sales of PPE.

Specifically, Herman announced that the company would be "recording the [PPE] deals on a net basis as opposed to [a] gross [basis], which we have done historically on our PaaS deals." He explained, "[t]his is being done as the nature of our services are different and accordingly our markup [on PPE sales] is our revenue." Herman went on to present an example of how to calculate a sales commission on a PPE "order value" of $500,000 where the cost is $400,000. In that scenario, a commission would be payable on the net $100,000 markup on the goods.

Stated more simply, the company elected in March 2020 to provide commissions on PPE sales, even though no such commissions on those sales

would have been payable under the strict terms of plaintiff's SCP. That company decision was further confirmed by Ramesh's email, which promised the sales force "[w]e are providing the same commissions on these one[-]time [PPE] orders and not penalizing [the salespersons] for [their] not being ARR." The company agreed to calculate the commission "using [PPE net] revenue . . . times the respective tier rate per [the salespersons'] commission agreement[s]."

We recognize that when defendants adopted the special commission rules for PPEs in March 2020, they did not procedurally comport with Section 12 of the SCP by sending plaintiff a signature copy of the PPE policy. Even so, defendants have not disputed their obligation to abide by the terms of the PPE commission policies as set forth in the March 2020 emails from Ramesh and Herman.

Also pertinent is the way the new PPE commission program was communicated to the sales force at the March 2020 meeting and again in the emails. Both Herman and Ramesh exhorted the salespersons to use PPE sales as a "great way" to "max out" their compensation. Ramesh emphasized that "[c]ommitment, perseverance, gumption and hustle shall be rewarded." These exhortations depict a concerted effort to incentivize plaintiff and her colleagues to get involved in this special program.

35

Given this evidence, we conclude the special compensation offered by defendants on PPE sales were not regular commissions within the scope of plaintiff's SCP. Instead, they were "supplementary incentives" designed to stimulate the salespersons to sell PPE as services during a time of sudden pandemic-related demand. The percentages on net (not gross) revenues offered by the company were above-and-beyond the ordinary commissions that salespersons could earn on the sales of PaaS, SaaS, and 3PL services.

Like the Wage Payment Law, the company's compensation policies and its March 2020 initiative addressing PPE sales are not a model of clarity. Indeed, internal documents between company officials reflect concern about whether their communications to the sales force about the PPE program might be confusing. In any event, despite various uncertainties, the record as a whole generally supports the motion judge's assessment that the company's compensation policies applicable to PPE sales are more akin to "supplementary incentives" sparked by the COVID-19 demand for PPEs, and less akin to regular wages and commissions.

Consequently, we concur with the trial court's determination that the commissions claimed by plaintiff on PPE sales were not "wages" under the Wage Payment Law but instead were "supplementary incentives." The trial

court correctly dismissed plaintiff's statutory claims, while still preserving plaintiff's right to pursue her breach-of-contract claims. Nothing in this opinion precludes any viable defenses that Suuchi may advance on remand to the trial court, nor any affirmative arguments plaintiff may advocate on her non-statutory theories.

Lastly, we stress we are presented here with a distinctive factual situation. In many, perhaps most, instances a promised commission will qualify as "wages" under the Wage Payment Law and not comprise a supplementary incentive. As we noted above, the exception should not be construed too broadly to swallow the rule. Further case-specific applications should help illuminate the concepts. Meanwhile, the Legislature is of course free to consider the adoption of clarifying amendments to the statute.

Affirmed and remanded for further proceedings on plaintiff's remaining claims. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-0841-23